BLUE CROSS OF IOWA and Blue Shield of Iowa, Iowa Nonprofit Corporation, Plaintiffs,

v.

Bruce W. FOUDREE, Insurance Commissioner of Iowa, Defendant,

and

Health Policy Corporation of Iowa, et al., Intervenors.

Civ. No. 84–597–A.

United States District Court, S.D. Iowa, C.D.

May 2, 1985.

L. Call Dickinson, Jr. and Craig F. Graziano, Dickinson, Throckmorton, Parker, Mannheimer & Raife, Des Moines, Iowa, for plaintiffs.

Thomas J. Miller, Atty. Gen., State of Iowa, Fred M. Haskins, Asst. Atty., Iowa Ins. Dept., for defendant.

Edwin N. McIntosh, Davis, Hockenberg, Wine, Brown & Koehn, Des Moines, Iowa, for intervenors.

## RULING AND ORDER

STUART, Chief Judge.

Plaintiffs, Blue Cross of Iowa [hereinafter "Blue Cross"] and Blue Shield of Iowa [hereinafter "Blue Shield"], brought this action against defendant, the Insurance Commissioner of the State of Iowa, on August 16, 1984. In their complaint, plaintiffs sought rulings (1) that Iowa Code Section 514.4 (1985) and Iowa Administrative Code § 510—34.7 violate the due process clauses, taking clauses, and contract clauses of the United States and Iowa Constitutions, and (2) that Iowa-Administrative Code § 510—34.7 is invalid as a matter of administrative rulemaking authority and statutory construction. Plaintiffs also moved for a preliminary injunction against enforcement of the challenged law and regulation on August 16.

On August 22, 1984, the Health Policy Corporation of Iowa, the Iowa Federation of Labor, and three Blue Cross-Blue Shield subscribers moved to intervene in order to defend the constitutionality of the challenged law and regulation. The motion to intervene was granted on August 31, 1984.

The Court heard arguments on plaintiffs' motion for preliminary injunction on August 31, 1984. At the hearing, the parties agreed that the federal constitutional issues could be deemed fully submitted without further hearing pursuant to Federal Rule of Civil Procedure 65(a)(2). The parties were given time to brief the federal constitutional issues and the issue whether the pendent state law questions should be certified to the Iowa Supreme Court. The Court granted the motion for preliminary injunction at the close of the hearing.

Defendant filed a motion to dismiss all state law claims from the complaint on the morning of the preliminary injunction hearing. After the motion had been resisted, the Court granted the motion to dismiss all state law claims on October 30, 1984. The Court was concerned that the Reserved Powers Clause of the Iowa Constitution might have been interpreted by the Iowa Supreme Court as an independent limitation on the Iowa Legislature's power to amend corporate charters. Thus, the Court indicated in its October 30 Order that it would stay its consideration of the federal constitutional issues, and that the preliminary injunction would extend sixty more days, allowing plaintiff time to seek a pre-

liminary injunction in state court under the Reserved Powers Clause.

On November 13, 1984, plaintiff moved the Court to reconsider its determination that the Reserved Powers Clause was an independent limitation. A hearing on the plaintiff's motion was held on December 13, 1984. After hearing the statements of counsel, the Court reconsidered its prior determination, and determined that the Reserve Powers Clause was not an independent limitation. In addition, the Court found that the federal constitutional issues were fully submitted, and extended the preliminary injunction until a decision on the merits was made.

Blue Cross was incorporated as a nonprofit corporation in 1939. Since 1939, Blue Cross has at all times been authorized to do business as a hospital service plan under the provisions of Iowa Code Chapter 514. Blue Shield was incorporated as a nonprofit corporation in 1945. At all times since 1945, Blue Shield has been authorized to do business as a medical and surgical service plan under the provisions of Iowa Code Chapter 514. Plaintiffs were established through private initiative, with a relatively small amount of seed money being provided by health care providers.

Plaintiffs were incorporated for the express purpose of establishing, maintaining, and operating a nonprofit hospital service plan (Blue Cross) and a nonprofit medical and surgical service plan (Blue Shield) whereby health care services would be provided at the corporation's expenses to those entering into contracts with the corporation (subscribers). According to plaintiffs' President, D. Eugene Sibery, plaintiffs' purpose is to provide subscribers with high quality health care coverage at affordable costs, while working with providers to accomplish the purpose.

As special nonprofit health care corporations, plaintiffs have throughout their existence been subject to a much higher degree of state regulation than have commercial health insurers or other corporations. Plaintiffs' articles of incorporation must be approved by defendant before they are effective. To assist the plaintiffs in meeting their purpose of providing health care services to Iowans, the State of Iowa has given plaintiffs several advantages over their commercial competitors. These advantages include an exemption from both the state insurance premium tax and all other provisions of the state insurance laws.

Plaintiffs had been required by former Iowa Code Section 514.4 to maintain at least a simple majority of health care providers on their respective boards of directors. Nomination of board members had been by the boards themselves, the boards' nominating committees, or the members of the corporation. Subscribers have often comprised a substantial portion of plaintiffs' boards. In fact, plaintiffs' President testified that currently eleven-twenty-thirds of the Blue Shield board are subscribers, and subscribers comprise the majority of the Blue Cross board.

Both Blue Cross and Blue Shield membership is effectively controlled by providers who have contracts with the corporations. With few exceptions, plaintiffs' members have at all times been health care providers under contract with plaintiffs. Plaintiffs' members do not invest any funds in plaintiffs in order to obtain membership. The sole pecuniary interest of the members is a very limited exposure for corporate losses.

Plaintiffs have come to be the largest health insurance organizations in Iowa. They operate throughout the state, and have over 700,000 contracts providing coverage for over 1.4 million Iowans. Blue Cross controls over thirty-eight percent of the Iowa hospital services insurance market. Blue Shield controls approximately thirty-five percent of the Iowa medical and surgical services insurance market.

In order to provide insurance, plaintiffs enter into contracts with members of the public, known as subscribers, and health care providers, such as hospitals and physicians. A subscriber contract binds plaintiffs to pay for the subscriber's health care services in return for the subscriber's payment of established premiums. A provider contract requires a health care provider to

provide services to plaintiffs' subscribers in return for the provider's agreement to accept certain amounts as payment in full for services. Plaintiffs, therefore, control a large share of the health care insurance market and are in the position to negotiate with subscribers and providers to establish premiums and payments for health care services.

In 1978, the Subcommittee on Oversight and Investigations of the United States House of Representatives' Committee on Interstate and Foreign Commerce found that there was a serious conflict of interest problem created by physician domination of most Blue Shield boards of directors. Physicians were found to comprise a majority of the boards of forty-four of the sixty-nine Blue Shield plans. In addition, the Subcommittee found that many nonphysician board members were persons selected by physicians or persons with close ties to the health care industry. This led the Subcommittee to conclude that the common practices of the Blue Shield plans permitted

> physicians to dominate Blue Shield plans to affect their reimbursement. It also prevents the plans from making effective independent decisions aimed at controlling costs and prevents policyholders from exercising an effective voice in determining the types of providers able to be reimbursed, the scope, and the cost of health care coverage.

Subcommittee on Oversight & Investigations of the House Comm. on Interstate & Foreign Commerce, 95th Cong., 2d Sess., Conflicts of Interest on Blue Shield Boards of Directors 3 (Comm. Print 1978). The Subcommittee also found that there was little effective state regulation of the conflicts of interest on the boards of the Blue Shield plans, and that the national Blue Shield Association was doing little to eliminate the conflicts of interest.

As recently as this year, the Michigan Supreme Court found that the board of Michigan's Blue Cross and Blue Shield plan has been the target of controversy because of its conflicts of interest. The Court found that the Michigan plan has been unresponsive to consumers' interests and lackadaisical in its cost-containment efforts. The primary reason for these defi-

ciencies is that the Michigan Blue Cross and Blue Shield board had been the subject of undue and excessive provider influence. *Blue Cross & Blue Shield v. Milliken*, 422 Mich. 1, 367 N.W.2d 1, 11, 19–20, 32 (1985).

The Iowa Governor's Commission on Health Care Costs found that the State was experiencing serious problems caused by rapidly increasing health care costs. According to the Commission, health care costs in Iowa had grown at a rate nearly twice that of the general rate of inflation. This increase in health care cost was determined to be detrimental to the Iowa public, and Iowa government and business.

Acting under the reserved power clause, Iowa Const., art. VIII, § 12, and Iowa Code § 491.39 (1983), the 1983 and 1984 Sessions of General Assembly of Iowa, enacted legislation intended to maintain the quality of health care services in Iowa, while improving the cost efficiency of the health care services industry. The new legislation was passed because the Legislature found there was an urgent need to abate the rapid rise in health care costs so as to keep health care accessible to all Iowans. One provision of the new legislation, Iowa Code § 514.4 (1985), requires a two-thirds subscriber majority on the boards of directors of all nonprofit health service corporations, including plaintiffs' boards.

Section 514.4, as amended, requires defendant to promulgate rules establishing a process for nomination of subscriber-nominees for nonprofit health service corporation boards. Defendant is directed to provide for each corporation an independent subscriber nominating committee, comprised of subscribers, to select all subscriber nominees and provider nominees until the two-thirds subscriber board majority requirement has been met. Section 514.4 also provides that after the two-thirds majority requirement is met, the board of directors will select all subscriber and provider nominees. Although Section 514.4 allows for petitioning for nomination by both subscribers and providers, it has been interpreted by defendant to vest veto power over such petitions for nomination in the

independent subscriber nominating committee until the two-thirds subscriber majority is in place and, subsequently, in the boards of director. Section 15 of the new law, Act of April 26, 1983, Ch. 27, § 15, 1983 Iowa Acts 46, requires that each nonprofit health service corporation shall have a simple subscriber board majority by August 1, 1984, and a two-thirds subscriber board majority by August 1, 1985.

The national Blue Cross and Blue Shield Association has for several years espoused the position that subscribers should be in the majority on Blue Cross and Blue Shield boards of directors. After the enactment of Section 514.4, both plaintiffs' management and executive committees recommended to plaintiffs' boards that, for various business- and policy-related reasons, plaintiffs comply with Section 514.4. Nonetheless, the plaintiffs' boards decided to go forward with litigation.

## I. Substantive Due Process

Plaintiffs contend that enforcement of Section 514.4 would deprive them of their property without due process of law, in violation of the Fourteenth Amendment of the United States Constitution. According to plaintiffs, the new law requiring subscriber majorities on plaintiffs' boards effectively divests plaintiffs and plaintiffs' members of the assets of the corporation, the financial investments of the corporate members, and the members' right to select corporate management and control the plaintiffs' policies.

At the outset, the Court finds that plaintiffs do not accurately characterize the effect of enforcement of Section 514.4. The corporations will retain possession of their assets. The new law does not vest the state or a group of subscribers with possession. Rather, the law shifts control of the plaintiffs' boards of directors from providers to subscribers. The reason for this reapportionment of board memberships is discussed more fully below.

Plaintiffs are nonprofit corporations organized to offer the public reasonably priced health insurance. The corporate members are not expected to benefit individually from their membership. The financial investments of the members in the corporations are small and the risks of loss are limited. Any economic benefit derived from the individual membership comes from the provider contract, not corporate membership. Although the assets of the corporations are substantial, the members of the corporation have no vested interest in them. Dissolution, if it should occur, would be supervised by the insurance commissioner. In the Court's opinion the traditional property rights protected by the due process clause of the federal and state constitution are not violated or compromised by the legislation in issue. There is a significant factual distinction between plaintiffs and its commercial competitors and other highly-regulated corporations such as public utilities.

Section 514.4 is a regularly-enacted law adjusting the burdens and benefits of economic life in Iowa. The law comes to this Court with a strong presumption of constitutionality. Plaintiffs bear the burden of showing that Section 514.4 has no reasonable relationship to a proper legislative purpose, or is arbitrary and discriminatory in nature. *Ferguson v. Skrupa*, 372 U.S. 726, 728–32, 83 S.Ct. 1028, 1029–32, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955); *Minnesota Ass'n of Health Care Facilities, Inc. v. Minnesota Dep't of Public Welfare*, 742 F.2d 442, 447 (8th Cir.1984); *see National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, — U.S. —, — — —, 105 S.Ct. 1441, 1458–59, 84 L.Ed.2d 432 (1985) (Fifth Amendment analysis).

The Court finds that the Iowa Legislature was eminently rational in concluding that requiring a subscriber majority on nonprofit health service corporation boards would bring about more effective health care cost containment by the corporations, thus better serving the purpose for which plaintiffs were organized. The conflicts of interest presented by the continuation of provider majorities had been disclosed by the Congressional Subcommittee in 1978. Health care costs had grown very rapidly notwithstanding efforts by government,

employers, and the health care industry to contain them. The Iowa Legislature, therefore, sought to utilize direct subscriber input in nonprofit health service corporation policymaking, by requiring subscriber majorities, to make the corporations more responsive to the cost-containment concerns of the subscribers and other non-provider entities. Section 514.4 is also neither arbitrary or discriminatory. In conclusion, the enforcement of Section 514.4 would not violate the Due Process Clause of the Fourteenth Amendment.

## II. Taking of Property Without Just Compensation

Plaintiffs contend that enforcement of Section 514.4 would effect a taking of every piece of corporate property without just compensation. According to plaintiffs, placing a subscriber majority on plaintiffs' boards transfers plaintiffs' property to what are in substance new and different corporations. This violates the *per se* rule prohibiting takings without compensation announced in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441–42, 102 S.Ct. 3164, 3179–80, 73 L.Ed.2d 868 (1982), because the State has carried out a permanent, physical occupation of all the corporations' property, according to plaintiffs.

The Court again rejects plaintiffs' characterization of the effect of enforcement of Section 514.4. As stated above, the corporations will retain possession of their assets. The reason for plaintiffs' corporate existence—maintaining health insurance plans that provide subscribers with access to high quality health care at affordable costs, with input from providers—will also remain unchanged. Enforcement of the new law, therefore, will not result in the type of physical appropriation addressed by the *Loretto* court. *Blue Cross & Blue Shield v. Milliken*, 422 Mich. 1, 367 N.W.2d 1, 25 (1985).

Furthermore, plaintiffs and other nonprofit health service corporations have always been subject to more state regulation than private commercial corporations. Part of that regulation was the require-

ment that all nonprofit health service corporations maintain a provider board majority. The Iowa Legislature repealed the provider majority requirement and replaced it with a subscriber majority requirement for the purpose of allowing subscribers direct input into plaintiffs' cost-containment policymaking process. Plaintiffs cannot contend that they had a vested right, based on the repealed law, in the Iowa Legislature continuing its mandate of provider board majorities. *National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, — U.S. —, —, 105 S.Ct. 1441, 1450–52, 84 L.Ed.2d 432 (1985). The State's efforts to ensure that subscriber board nominees are unbiased does not significantly increase the degree of state intervention. State government plays no more direct role in effecting the subscriber majority requirement than it did in effecting the provider majority requirement.

In summary, the Court concludes that enforcement of Section 514.4 will not bring about a permanent, physical invasion of plaintiffs' property. Rather, Section 514.4 is government regulation intended to affect the corporate structure of the plaintiff corporations in order to provide subscribers input into the corporations' policymaking processes. The Court will analyze the constitutionality of Section 514.4 as such.

In *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the United States Supreme Court set forth the standard for deciding whether a government action so burdens certain persons' exercise of property rights as to require compensation under the Takings Clause. The Court must, as done above, analyze the character of the government action. "A taking may more readily be found when the interference with property can be characterized as a physical invasion by government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* at 124, 98 S.Ct. at 2659. (citation omitted). In addition, the Court

must analyze the economic impact of the regulation and, particularly, the extent to which the regulation has interfered with distinct, investment-backed expectations. *Id.* The Court has already determined that Section 514.4 is more in the nature of a regulation intended to adjust the benefits and burdens of economic life for the common good than a physical taking.

Plaintiffs have not presented much evidence showing the predicted economic impact enforcement of Section 514.4 will have on them. Plaintiffs' President has indicated that the corporations will continue to function if Section 514.4 is enforced. In fact, a member-selected subscriber majority currently sits on the Blue Cross board.

Eight other states have enacted laws similar to Section 514.4 and nonprofit health service plans have not been shown to have suffered economic losses as a result. There is no evidence before the Court that a board with a subscriber majority will make less well-reasoned business judgments, resulting in economic losses to plaintiffs. Plaintiffs' members' small investment in plaintiffs will be as secure with a subscriber majority on plaintiffs' boards as with a provider majority. *See also Blue Cross & Blue Shield v. Milliken*, 422 Mich. 1, 367 N.W.2d 1, 25 (1985) (finding plan members have no significant investment and no investment-backed expectations).

■ Accordingly, the Court concludes that enforcement of Section 514.4 will not effect a taking of plaintiffs' property. The subscriber board majority requirement is substantially related to the general welfare, and has not been shown to be likely to have an adverse economic impact on plaintiffs.

### III. Impairment of Contractual Obligations

Plaintiffs contend that Section 514.4 so impairs plaintiffs' corporate charter that the law must be held invalid under the Contract Clause, Art. I, § 10, cl. 1. According to plaintiffs the result on this issue is controlled by *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), and its progeny. Plaintiffs state that the cases uniformly hold that a "fundamental" change in a corporate charter is constitutionally invalid, that the State's enforcement of Section 514.4 would transfer control of them to persons other than those specified in the charter, and that such would be a "fundamental" change.

To support the fundamental change standard, plaintiffs cite several United States Supreme Court cases; one 1883 lower federal court opinion; and several state supreme court opinions, only one of which was handed down in this century. The Court is not certain that the fundamental change standard retains any vitality. *Blue Cross & Blue Shield v. Milliken*, 422 Mich. 1, 367 N.W.2d 1 at 12 (1985). *Compare Miller v. New York*, 82 U.S. (15 Wall.) 478, 498, 21 L.Ed. 98 (1872) *with Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410–13, 103 S.Ct. 697, 704–06, 74 L.Ed.2d 569 (1983). The Court, finds, however, that Section 514.4 is valid under either the fundamental change standard or the modern balancing standard for contracts clause analysis.

### A. Fundamental Change Standard

In *The Dartmouth College Case*, the United States Supreme Court determined that a charter from a state to a private corporation is a contract, within the meaning of the contract clause. Consequently, the Court ruled unconstitutional a New Hampshire statute increasing the number of trustees of Dartmouth College as fixed by its charter, and providing for the appointment of a majority of the trustees by the executive government of New Hampshire. Justice Story, in his concurring opinion, declared that, if state legislatures intended to exercise the power to take away corporate powers or franchises, the legislatures must reserve such power in granting corporate charters. After *The Dartmouth College Case*, many states inserted, either in their statutes or in their constitutions, a provision that charters

thereafter granted would be subject to amendment or repeal at the pleasure of the legislature. The effect of such reserved power provisions is to reserve to the legislature the power to amend any corporate charter in any manner the legislature deems necessary to effect the purposes of the grant; to protect the interests of the public, the corporation, its shareholders or creditors; or to promote the due administration of corporate affairs; provided the purpose of the grant and any right vested under the grant is not impaired. *Miller v. New York, supra,* at 498.

In this case the Iowa Legislature enacted Section 514.4 for a legitimate reason. The purpose for the corporate existence of plaintiffs is not impaired. Rather, plaintiffs will continue to seek to provide high quality health care to subscribers at affordable rates, with provider input. In addition, the plaintiffs do not have a vested right in continuation of provider board majorities.

One of the cases cited by plaintiffs, *Miller v. New York, supra,* indicates that Section 514.4 is constitutionally sound under the fundamental change standard. In *Miller,* the New York state legislature had enacted a general railroad act authorizing the formation of railroad corporations, subject to both state constitutional and statutory reservations of power. The stock subscribed to the railroad in *Miller* amounted to 9775 shares. By statute amending the city charter of the City of Rochester, the City was authorized to purchase 3000 shares of the railroad stock. The legislature also granted the City the power to elect a minority of the railroad board of directors (4 of 13) to correlate with its expected interest in the corporation.

Only 5,552 shares of the railroad subscription, however, was ever sold and actually paid for. Thus, although the City held the majority of shares fully paid, it was in the minority on the railroad board. The New York Legislature, due to the changed circumstances, enacted a law vesting the City with the authority to elect a majority (7 of 13) of railroad board members.

The City elected its seven new board members. The non-city stockholders, denying the validity of the new act, elected nine directors as permitted by the old law. The City sued to enforce the new law.

The *Miller* Court applied the fundamental change standard. Rather than strike down the new law, however, the court rejected the non-city stockholders' claims that they had vested rights in retaining a board majority. The *Miller* Court determined that the state legislature had the power, under its reserved power, to change the apportionment of the board "as the ends of justice or the best interest of all concerned may require." *Id.* at 498. The *Miller* holding was followed in *Looker v. Maynard,* 179 U.S. 46, 21 S.Ct. 21, 45 L.Ed. 79 (1900).[1]

▮▮▮ The Court cannot see a principled distinction between the facts in *Miller* and facts presented here. Plaintiffs do not have a vested right in continuation of a provider board majority. Changed circumstances have resulted in the Iowa Legislature deciding to change the apportionment of providers and directors on plaintiffs' boards for what the Legislature found to be the best interest of the public. In summary, the Court concludes that, even under the more favorable fundamental change standard advanced by plaintiffs, Section 514.4 does not violate the Contract Clause.

### B. Balancing Standard

▮▮▮ Although the Contract Clause is absolute in terms, in modern times its prohibition has been construed to accomodate the police powers of the State to safeguard the interests of its people. The threshold inquiry of Contract Clause analysis is

---

1. To whatever extent the Court's holding differs from the holding in *Board of Regents v. Trustees of the Endowment Fund,* 206 Md. 559, 112 A.2d 678, 686, *cert. denied,* 350 U.S. 836, 76 S.Ct. 72, 100 L.Ed. 746 (1955), the Court finds that the facts in *Board of Regents* are distinguishable. The *Board of Regents* Court found that the very

purpose of the corporation was defeated by the statute, and that the statute was arbitrary, unreasonable and without any justification arising out of the State's police power. *Id.* at 686. Here, the court finds that the purpose of plaintiffs is not affected, and that Section 514.4 is a reasonable exercise of the State's police power.

whether the challenged statute has operated as a substantial impairment of a contractual relationship. A critical factor to be considered in determining the extent of impairment is whether the industry the complaining party has entered has been regulated in the past. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 410–411, 103 S.Ct. 697, 704–05, 74 L.Ed.2d 569 (1983). If the state law constitutes a substantial impairment, the statute is still valid if the state (1) has a significant and legitimate public purpose for enacting the law, and (2) the means adopted to implement the law are reasonably related to the public purpose. *Id.* at 411–13, 103 S.Ct. at 704–06.

■ The Court finds that enforcement of Section 514.4 will not operate as a substantial impairment of plaintiffs' charters or other contractual relationships. The law will only cause a change in the proportion of providers and subscribers on the boards of directors. As stated above, this change in apportionment will not in any way change the purpose of plaintiffs or impede plaintiffs' ability to manage their business affairs. In addition, plaintiffs have always been two of only a few nonprofit health service corporations subject to a very high degree of state regulation. The provider-subscriber composition of plaintiffs' boards has always been dictated by statute, and defendant's approval has always been required before plaintiffs' articles of incorporation were effective. Because plaintiffs have always been subject to very high degree of state regulation and the enforcement of Section 514.4 does not change the purpose or detrimentally affect plaintiffs' management capabilities, the Court finds that enforcement of Section 514.4 will not operate as a substantial impairment of plaintiffs' charter or other contractual rela-

tionships. *See Blue Cross & Blue Shield v. Milliken,* 422 Mich. 1, 367 N.W.2d 1, 19, 22–23 (1985).

Even were the Court to find that enforcement of Section 514.4 operates as a substantial impairment, it would still uphold the constitutionality of the law under the second prong of the balancing standard. The Court has already stated that Section 514.4 has a significant and legitimate public purpose: providing for input from unbiased subscribers in plaintiffs' policymaking. The method selected by the legislature and defendant is designed for rapid, efficient implementation, and to guarantee that the subscriber nominees to be selected by plaintiffs' members are not biased toward provider interests. The method is reasonably related to the Iowa Legislature's purpose. *See Blue Cross & Blue Shield v. Milliken,* 422 Mich. 1, 367 N.W.2d 1, 19–20, 23 (1985). Accordingly, the Court concludes that enforcement of Section 514.4 would not violate the Contract Clause under the balancing standard.

In conclusion, the Court rejects all plaintiffs' challenges to the validity of Section 514.4. The Court, therefore, lifts the preliminary injunction and denies plaintiffs' request for permanent injunctive relief.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk of Court is hereby authorized to enter judgment for costs against the plaintiffs and in favor of the defendant.