LOKEN, Circuit Judge,
with whom BOWMAN, Circuit Judge, joins, concurring.
I concur in Part II.B. of the court’s opinion, concluding that the Minnesota statute at issue does not violate Honeywell's right to substantive due process, except to the extent that the rollover paragraph on pages 18 and 19 is inconsistent with my view of the Contract Clause issue. As to that issue, I respectfully disagree with the court’s conclusion that no contract has been impaired, but I agree that there has been no unconstitutional impairment. Accordingly, I concur in the court’s decision to affirm.
As the court explains, the modem Contract Clause analysis is (1) has the State impaired a contract, (2) is the impairment substantial, and (3) is the statute nevertheless a permissible exercise of the State’s police power. See General Motors v. Romein, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992); Energy Reserves, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 703-04, 74 L.Ed.2d 569 (1983). The latter two factors are interrelated. “The severity of the impairment measures the height of the hurdle the state legislation must clear.” Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978).
1. Was There a Contract. My starting point on this question is Coombes v. Getz, 285 U.S. 434, 440-42, 52 S.Ct. 435, 435-36, 76 L.Ed. 866 (1932), in which California repealed a constitutional provision holding corporate directors personally liable to creditors for embezzled or misappropriated corporate funds. In holding that the repeal unconstitutionally impaired a creditor’s contract with a corporation, the Court described the repealed liability as “in its nature contractual.” Justice Cardozo in dissent observed that to call the liability contractual was “a legal fiction ... borrowed from the law of quasi contracts.” But he nonetheless agreed that the Contract Clause may protect a creditor’s “contract with a corporation secured in certain contingencies by a statutory liability.”
To me, Coombes confirms that a statute may create a contract between private parties that the Contract Clause protects. See also Steamship Co. v. Joliffe, 2 Wall. 450, 69 U.S. 450, 456-57, 17 L.Ed. 805 (1864) (statute created contract between shipping company and harbor pilots); Hawthorne v. Calef, 2 Wall. 10, 69 U.S. 10, 22, 17 L.Ed. 776 (1864) (statute providing that stock is security for railroad’s creditors created contract between creditors and shareholders). All recent Supreme Court eases analyzing whether a statute had created a contract for Contract Clause purposes dealt with obligations of the State, rather than, as in Coombes, obligations the State has compelled private parties to assume. But that should not alter the analysis. For example, even if a statute mandates the terms of a fire insurance policy, the policy is still a contract. Accord In re Workers’ Compensation Refund, 46 F.3d 813, 818 (8th Cir.1995).
In this case, the statute created the Guaranty Association, a private non-profit entity consisting of all insurers wishing to do business in the State, and required that entity to guarantee the “covered policies” of its members in the event of an insolvency. That third party guaranty looks much like the statutory liability in Coombes. “In determining whether a particular statute gives rise to a contractual obligation, it is of first importance to examine the language of the statute.” National R.R. Passenger Corp. v. At-chison, Topeka & S.F. Ry., 470 U.S. 451, 466, 105 S.Ct. 1441, 1452, 84 L.Ed.2d 432 (1985). Here, the statute uses the word “guaranty” in its title and provides that the Association “shall ... guarantee, assume, or reinsure” the obligations of its members. Minn.Stat. § 61B.06, subd. 1 (1986). A guaranty is a contract under Minnesota law. See Baker v. Citizens State Bank of St. Louis Park, 349 N.W.2d 552, 557-58 (Minn.1984). In these circumstances, Honeywell has had a “contract” impaired, either its underlying investment contracts with ELIC or, more directly, the guaranty by the Guaranty Association. The contrary conclusion of the Minnesota Supreme Court, though entitled to deference in its construction of state law, is not binding *558 on us for Contract Clause purposes. See Romein, 503 U.S. at 187, 112 S.Ct. at 1110.
2. Was the Contract Substantially Impaired. Total destruction of a contract is a substantial impairment. Home Building & Loan Ass’n v. Blaisdell, 290 U.S. 398, 431, 54 S.Ct. 231, 237, 78 L.Ed. 413 (1934). At first glance, this case seems to involve total destruction of the guaranty rights of non-resident Honeywell employees. But that ignores the nature of the guaranteed contracts. As a GIC trade association monograph explained, “GICs are assets of the pension plan. Individual employees do not own any part of a GIC, nor do employees have any individual rights under the contract.” Thus, properly viewed, the impairment is partial — a reduction in the Association’s guaranty obligation to the Honeywell Plan. (Whether that loss to the Plan must ultimately be borne only by non-resident beneficiaries is an issue not before us.)
Though partial, the impairment is quantitatively substantial — based on the percentage of non-resident Honeywell employees, the statutory amendment deprived the Plan of some 75% of its guaranty claim against the Association. In addition, the impairment was not merely incidental to another legislative purpose; the statute was enacted to impair. Compare Energy Reserves, 459 U.S. at 418, 103 S.Ct. at 708; Exxon v. Eagerton, 462 U.S. 176, 194 n. 14, 103 S.Ct. 2296, 2307, 76 L.Ed.2d 497 (1983).
Beyond the sheer magnitude of an impairment, the Supreme Court looks at whether the impaired term was central to the contract, whether settled expectations have been disrupted, and whether the impaired right was reasonably relied on. See El Paso v. Simmons, 379 U.S. 497, 514, 85 S.Ct. 577, 586-87, 13 L.Ed.2d 446 (1965); Spannaus, 438 U.S. at 243 n. 14, 98 S.Ct. at 2722 n. 14. In general, when an industry is heavily regulated, parties are considered to have less reasonable expectation that legislation will not alter their contractual arrangements. See Energy Reserves, 459 U.S. at 411, 103 S.Ct. at 704. These other factors cut against the substantiality of this impairment. As in Veix v. Sixth Ward Bldg. & Loan Ass’n of Newark, 310 U.S. 32, 38, 60 S.Ct. 792, 794-95, 84 L.Ed. 1061 (1940), the industry is both heavily regulated and “regulated in the particular to which [Honeywell] now objects,” since the State created the impaired guaranty. Honeywell cannot show substantial reliance on the Association’s guaranty when it purchased the GICs in 1988 because the Association has broad power to unilaterally impose conditions on its guaranty obligations, subject to the Commissioner’s approval, including the power to declare a moratorium on payments. See Minn.Stat. § 61B.06, subds. 1-3 (1986); Honeywell v. Minnesota Life & Health Ins. Guar. Ass’n, 518 N.W.2d 557, 563 (Minn.1994).
On the other hand, recent Eighth Circuit cases have looked unfavorably on retroactive legislation impairing contracts, even in heavily regulated industries. See Workers’ Compensation Refund, 46 F.3d at 820 (statute confiscating excess reinsurance premiums invalid though reinsurance plan documents incorporated changes in state law); Holiday Inns Franchising, Inc. v. Branstad, 29 F.3d 383, 384 (8th Cir.), (statute retroactively restricting franchisor termination rights invalid), cert. denied, — U.S.-, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); Minnesota Ass’n of Health Care Facilities, Inc. v. Minnesota Dept. of Public Welfare, 742 F.2d 442, 451 (8th Cir.1984) (statute retroactively reducing nursing home rates for medicaid patients invalid “because it disrupts settled and completed financial arrangements under contracts made in reliance on existing law”), cert. denied, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).
On balance, I conclude this impairment is substantial. Honeywell lost 75% of its guaranty benefit. Cf. Spannaus, 438 U.S. at 247, 438 U.S. at 239-40 (statute imposing $185,000 pension charge on employer closing state office was substantial impairment). Thus, on the sliding scale the Supreme Court uses for the last two Contract Clause factors, this impairment requires close scrutiny of the State’s justification.
8. Is the Substantial Impairment Justified. The economic interests of a state may justify its impairing contracts, see, e.g., Blaisdell, 290 U.S. at 437, 54 S.Ct. at 239-40, but the Contract Clause imposes limits on that *559 power. “Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.” United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 22, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977). Given the deference paid to state legislatures, especially when the State is not a party to the impaired contract, most claims founder on this aspect of the modem Contract Clause analysis. The Supreme Court looks hard at whether there is a legitimate public purpose and then defers to the legislative judgment as to the reasonableness of a particular remedy. See Energy Reserves, 459 U.S at 412-13, 103 S.Ct. at 704-06.
Of particular importance in this ease, the Court has stated that it is reasonable to amend a statute to eliminate unforeseen consequences or windfall benefits, even if that impairs existing contracts. See U.S. Trust, 431 U.S. at 31 & n. 30, 97 S.Ct. at 1522 & n. 30; Energy Reserves, 459 U.S. at 412, 103 S.Ct. at 704-05. For example, the Court in U.S. Trust explained that the amendment in El Paso was valid because it simply limited parties “to those gains reasonably to be expected from the [original] contract.” Conversely, the amendment struck down in U.S. Trust was not in response to windfall benefits or unforeseen consequences because it repealed a provision expressly prohibiting the use of Port Authority revenues for transportation subsidies.
In this case, the Minnesota Legislature based its initial 1977 statute on the NAIC Model Life & Health Guaranty Association Act. The Model Act at that time provided that the association must guarantee all obligations of an insolvent domestic insurer. For an insolvent foreign or out-of-state insurer, however, the association only guaranteed “the covered policies of residents,” and it would have “no liability” if that insurer’s home State provided “substantially similar” protection “for residents of other states.” See Minn.Stat. § 61B.06, subds. 2 and 4 (1986). In other words, if every State had enacted this Model Act and uniformly applied it, the association in an insolvent U.S. insurer’s home State would pay all guaranty claims. But if an offshore insurer grabbed everyone’s money and went under, each State’s association would guarantee the covered policies of that State’s residents.
In this environment, Honeywell’s guaranty claim for its investment in ELIC GICs posed a substantial unforeseen consequence in Minnesota for three reasons. First, the legislators who enacted the initial Minnesota statute in 1977 did not foresee that, unlike regulators in most every other State, Minnesota’s Commissioner would take the position in the 1980s, before ELIC became insolvent, that GICs are “covered policies,” and the Supreme Court of Minnesota would agree in Minnesota Life & Health Ins. Guar. Ass’n v. Department of Commerce, 400 N.W.2d 769, 773-74 (1987). As a result of this lack of uniform implementation, when Honeywell sent its ELIC claims to all fifty States, it received blanket denials from most everyone except Minnesota.
Second, the Legislature did not foresee that “covered policies” would include group annuities in which a single contract holder, rather than thousands of beneficiaries, is the “resident.” One can argue that this issue was reasonably foreseeable. But I see no indication that even the drafters of the various Model Acts anticipated the problem before 1985. That the issue was unforeseen is confirmed by the fact that any careful drafter familiar with ERISA insurance-funded group life and health plans would not try to solve this complex an issue with the single word “resident.”
Third, Honeywell took the position that the $300,000 statutory ceiling on the Association’s liability “for all benefits ... with respect to any one life,” Minn.Stat. § 61B.06, subd. 8 (1986), does not apply to its GIC claims. That exposed the Association to a $111,000,000 claim, far more than any State has allowed in expressly covering GICs. See Minn.Stat. § 61B.19, subd. 4(6) (1996) ($7,500,000 limit on claims regarding “unallocated annuities of a retirement plan”); 1985 NAIC Model Act § 3(e)(2)(B) ($5,000,000 limit).
Faced with this surprising confluence of factors that produced a genuinely unforeseen consequence and arguable windfall benefit, *560 the Legislature enacted an amendment that reduced the Association’s statutory guaranty to a level that Honeywell (or any other plan sponsor) should reasonably have expected from the statute as originally enacted: because GICs are not “covered policies” in California, ELIC’s home State, the Minnesota Association must guarantee ELIC’s GIC obligations to Minnesota residents; therefore, the Honeywell Plan is entitled to a guaranty benefit equal to that portion of its GIC contracts that represent investments on behalf of its Minnesota resident beneficiaries.
In enacting this amendment, the State acted in furtherance of the legitimate economic interests of its citizens.[3] The effect of its action was to reduce a state-mandated private benefit in a manner not inconsistent with the reasonable expectations of the parties to that “contract.” In these circumstances, I concur in the court’s conclusion that Minnesota did not unconstitutionally impair the Contract Clause rights of the Honeywell Plan trustee or the Plan’s ultimate employee beneficiaries.

. As the court observes in its substantive due process discussion, because the Association’s liabilities are unfunded — claims are paid by post-insolvency assessments of the remaining, solvent members — it does not take a team of actuaries to deduce that if Minnesota compels the Association to bestow uniquely generous guaranty benefits on the non-Minnesota customers of this year’s insolvent insurer, ELIC, the Association’s members must eventually recoup those benefits by imposing higher insurance premiums on future Minnesota policyholders.