BOARD OF REGENTS OF THE UNIVERSITY OF MARYLAND *v*. TRUSTEES OF THE ENDOWMENT FUND OF THE UNIVERSITY OF MARYLAND ET AL.

[No. 111, October Term, 1954.]

560

*Decided March 24, 1955.*

*Petition for certiorari filed in Supreme Court of United States, July 6, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, and HENDERSON, JJ.

*David Kauffman*, Assistant Attorney General, with whom were *C. Ferdinand Sybert*, Attorney General, and *Harrison L. Winter*, Deputy Attorney General, on the brief for appellants.

*David C. Green* and *H. Vernon Eney*, with whom were *Venable, Baetjer & Howard* and *Carlyle Barton*, on the brief, for appellees.

HENDERSON, J., delivered the opinion of the Court.

The question presented on this appeal, from a final decree entered after the Chancellor had overruled a demurrer to a bill of complaint and the appellants declined to answer, is the constitutional validity of Chapter 5 of the Acts of 1952. This Act undertook to amend the Charter of the corporation operating under the name of "The Trustees of the Endowment Fund of the University of Maryland" to provide that thereafter its members should be the Regents of the University of Maryland and that "all the rights, powers, duties, obligations, and functions" of its members should be conferred upon the Regents. By its decree, the court below held that the Act is unconstitutional and enjoined the Board of Regents "from interfering with, taking possession of or attempting to exercise any control over the funds, property and assets" of the corporation, and also enjoined the Maryland Trust Company, the agent and custodian of the securities and funds of the corporation, from delivering the same to the Regents. Since the Maryland Trust Company is in the nature of a stakeholder we shall hereinafter refer to the corporation whose charter was amended as "the appellee".

The appellee contends that the Act violates: (1) Article I, Section 10 of the Federal Constitution prohibiting the impairment by a state of the obligation of contracts, (2) the Fourteenth Amendment to the Federal Constitution and its State equivalent, Article 23 of the Maryland Declaration of Rights, regarding due process, (3) the Fourteenth Amendment regarding equal protection of the laws, and (4) Article III, Section 40 of the Maryland Constitution prohibiting the taking of private property for public use without just compensation. It also contends (5) that the Act violates Article III, Section 29 of the Maryland Constitution regarding defective title, and (6) Article III, Section 33 regarding special laws. Before discussing any of these points it is necessary to state the corporate and legislative history in some detail.

The appellee was originally incorporated on June 29, 1893, under the name of "The Trustees of the Endowment Fund of the Faculty of Physic of the University of Maryland of Baltimore City", pursuant to the General Corporation Laws of Maryland. Since then the charter has been amended three times: by Chapter 529, Acts of 1904; by Chapter 435, Acts of 1929; and by Articles of Amendment filed with the State Tax Commission of Maryland on April 9, 1946, pursuant to the General Corporation Laws of Maryland.

At the time the corporation was formed the University of Maryland consisted only of the professional schools in Baltimore City, the part of the University now located at College Park being then known as the Maryland Agricultural College. For the early history of the University see *The Regents of the University of Maryland v. Williams,* 9 G. & J. 365 (1838). A principal school of the University of Maryland in 1893 was the Medical School. The original charter of the appellee recited that it was formed by the nine incorporators as "* * * a corporation for educational purposes in connection with and in aid of the School of Medicine * * * and for the specific object of receiving, investing and controlling an endowment fund for said School of Medicine and applying the income thereof in the discretion of said Trustees to the exclusive benefit of said School". Management was lodged in an executive committee of four of the trustees. Its corporate existence was limited to a period of 40 years.

By Chapter 529, Acts of 1904, the charter was amended so as to change the name to its present form, to correspondingly enlarge its purposes, and to give the corporation perpetual succession. It was provided in Section 2 that the nine persons who were then the members "shall severally continue as such until their membership be terminated by death, resignation or removal." In the event of a vacancy, the remaining members were authorized to fill the vacancy from alumni of the University of Maryland, the membership at all times to consist of

five graduates of the School of Medicine and four graduates of the School of Law. These eligibility requirements were eliminated by Chapter 435, Acts of 1929. Section 4, Chapter 529, Acts of 1904, provided for an executive committee of four to be elected by the members annually from among their own number, who were empowered to manage the affairs of the corporation and to elect a president and secretary and treasurer. It was directed to report annually to the General Alumni Association of the University. The Act also specifically provided that the Act should take effect only after the provisions thereof had been accepted by resolution of the corporation. It was so accepted, as was the amendment of 1929.

At a meeting of the members of the corporation held on March 12, 1946, Articles of Amendment were adopted which struck out all sections of the charter and inserted four new sections. These articles were duly filed with the State Tax Commission under the general law. Except for the persons who were named as the then members, the four sections were virtually identical with the provisions of the charter as amended by the Acts of 1904 and 1929, but a requirement that all investments be registered in the name of the trustees was eliminated.

Accordingly, the corporation may be described as a non-stock corporation of a charitable nature, composed of nine members with perpetual succession who are self-perpetuating, the power of management being lodged in an executive committee of four members. Among the powers set out in Section 3 are: "to receive, hold, invest and control any money, funds or other property * * * as an endowment fund or funds for said University of Maryland, and either any or all of its several separate faculties and departments, and to apply the income of such fund or funds in its discretion to the benefit of said University and the several faculties and departments thereof to whichever such fund or funds may respectively appertain." It is also empowered to accept "money, funds or other property in trust for said University and

any or all of its several faculties and departments, and the same to administer according to the declared purpose of such trusts".

At the 1951 session of the General Assembly there was introduced and passed House Bill No. 701, reading as follows:

"AN ACT to repeal Section 2 of Chapter 435 of the Acts of 1929, said Act amending the Charter of the Trustees of the Endowment Fund of the University of Maryland, and to enact in lieu thereof a new section, said section to be known as Section 2 and relating to the membership of the Corporation known as 'The Trustees of the Endowment Fund of the University of Maryland'.

"Section 1. Be it enacted by the General Assembly of Maryland, That Section 2, Chapter 435 of the Acts of 1929, be and it is hereby repealed.

"Sec. 2. And be it further enacted, That a new section to be known as Section 2, said section to be in lieu of Section 2 of Chapter 435 of the Acts of 1929 and in lieu of Section 2 of Chapter 529 of the Acts of 1904, be and the same is hereby enacted to read as follows:

"2. The said corporation shall have perpetual succession and its members shall be the Regents of the University of Maryland, constituted and organized at present, and such other or additional members of the said Regents of the University of Maryland as may, from time to time, be appointed as authorized by law; and all the rights, powers, duties, obligations, and functions now conferred by any and every provision of law or by the Charter of 'The Trustees of the Endowment Fund of the University of Maryland' shall be conferred upon the Regents of the University of Maryland, it being the intention of this Act that said Regents shall,

from the date of passage hereof, be considered for all purposes as the sole members of the Corporation found [sic] under Articles of Incorporation dated the 29th day of June, 1893, and recorded among the Charter Records of Baltimore City in Liber J. B. No. 31 at folio 167, as said charter has been amended from time to time.

"Sec. 3. And be it further enacted, That this Act shall take effect June 1, 1951."

H. B. 701 having been presented to the Governor, he returned it to the House without his approval on May 7, 1951, noting that the corporation was chartered under the General Corporation Laws and did not derive its existence from legislative act, that the bill would "defeat the purposes" for which the trusts had been created and "frustrate the purpose of the donors", and that its constitutionality appeared to be "extremely questionable". Acts of 1951, pp. 2143, 2144. Nevertheless, the bill was passed over his veto, and became effective June 1, 1952, as Chapter 5, Acts of 1952. It has never been accepted or acted upon by the corporation.

The endowment funds now held by the Trustees amount to about $2,000,000, and the annual income to about $38,000. There are some 42 separate funds, some of which are restricted. In soliciting contribution to the Endownment Fund, emphasis had always been placed on the permanence of the Endowment Fund, the fact that only interest would be expended, and that the Fund would always be managed and controlled by a separate corporation completely independent of the governing body of the University.

The University of Maryland, as now constituted, was formed in 1920 by merger of the old University and the Maryland State College of Agriculture. Chapter 480, Acts of 1920. The Regents were vested with the powers of management, and the Act of 1920 was duly approved by the governing boards of the merging institutions. By Chapter 925, Acts of 1941, the number of Regents

was increased from 9 to 11. The corporation has the status of a State agency. *University of Maryland v. Maas,* 173 Md. 554; *University v. Murray,* 169 Md. 478. All of the Regents are appointed, from time to time, by the Governor.

The contention that the transfer, of the entire power of management and control of the appellee corporation and its funds from the Executive Committee selected by its members to the Board of Regents of the University, is an impairment of the obligation of contract, is met at the outset by the contention that the alteration of the charter is within the power reserved to the Legislature. Following the decision of the *Dartmouth College* case, 4 Wheat. (U. S.) 518 (1819), that the corporate charter of an educational institution was a contract which the State was forbidden to change by legislative enactment, a reservation of the power to alter or repeal charters thereafter granted was written into the constitutions of many states. It was written into our Constitution of 1851 and restated in our Constitution of 1867 in these words: "* * * all charters granted or adopted in pursuance of this section, and all charters heretofore granted and created subject to repeal or modification, may be altered from time to time, or be repealed; * * *." Article III, Section 48. In the General Corporation Law of 1868 (Chapter 471, Acts of 1868) it was provided in Section 77 that every corporate charter, when granted, should be subject to "all provisions and regulations which may hereafter, by any change in or amendment of the laws of this State, be made applicable to such corporation." In Code (1951), Art. 23, Sec. 1(g), it is provided that "The charter of every corporation formed prior to June 1, 1951, which is subject to repeal or modification and the charter of every corporation formed under the provisions of this Article shall be subject to repeal or modification by public general law of the General Assembly."

Passing the question as to whether the reserved power can be validly exercised by a special act under

the circumstances of the instant case, the question arises whether the contract clause of the Federal Constitution can ever be invoked in the case of a corporation formed subject to the reserved power of alteration or repeal. The appellant contends that the reserved power is one of the terms of the contract, and any objections to its exercise must be sought in other provisions of the basic law. In what appears to be the latest expression of the United States Supreme Court on the subject, *Phillips Petroleum Co. v. Jenkins*, 297 U. S. 629, 634, it was said: "The reservation of power to amend is a part of the contract between the State and the corporation and therefore § 10 of Art. I of the Federal Constitution does not apply." Cf. *Noble State Bank v. Haskell*, 219 U. S. 104, 109. But continuing, the court said: "The reserved power is not unlimited and cannot be exerted to defeat the purpose for which the corporate powers were granted, or to take property without compensation, or arbitrarily to make alterations that are inconsistent with the scope and object of the charter or to destroy or impair any vested property right." Many other cases state the proposition that the reserved power cannot be exercised so as to defeat or substantially impair the fundamental purpose for which a corporation is formed. *Holyoke Co. v. Lyman*, 15 Wall. (U. S.) 500, 522; *Shields v. Ohio*, 95 U. S. 319, 324; *Fair Haven R. R. Co. v. New Haven*, 203 U. S. 379, 388; *Breslav v. N. Y. & Queens Elec. Light & Power Co.*, 249 App. Div. 181, 185, aff. without opinion, 273 N. Y. 593; *Sprigg v. Western Tel. Co.*, 46 Md. 67, 78. In *Webster v. Cambridge Seminary*, 78 Md. 193, 205, Chief Judge Robinson said: "The right * * * of the Legislature to alter and amend the charter of the defendant corporation is not, and could not, be denied. At the same time we agree with the appellant that it could not change fundamentally the nature and character of the charter itself. It could not, under the guise of an amendment, substitute a new and different charter with distinct and different purposes, and oblige the stockholders to accept it. Nor could it divest prop-

erty rights acquired under the legitimate exercise of the powers granted. Independent altogether of the contract clause of the Federal Constitution is the provision which declares that no one shall be deprived of his property without due process of law." It was held that a charter amendment authorizing the directors to enter into a lease of school property was not a fundamental change.

The charter in the instant case is, of course, a contract between the State and the incorporators. As pointed out by Mr. Justice Story, in his concurring opinion in the *Dartmouth College* case, *supra,* (p. 689) there is also "an implied contract springing up, and founded on a valuable consideration, that the crown would not revoke, or alter the charter, or change its administration, without the consent of the corporation. There was also an implied contract between the corporation itself, and every benefactor upon a like consideration, that it would administer his bounty according to the terms, and for the objects stipulated in the charter."

It may well be that there are also implied contracts between the subscribers to the common fund. The appellee argues that although the State may repeal the charter outright, with consequences that might lead to distribution of the assets to the donors or reversioners, to a trustee appointed by the court under its general equity powers, or, in an appropriate case, to another corporation under the *cy-pres* power conferred by Code (1951), Art. 16, sec. 131 (Ch. 291, Acts of 1931), it cannot compel the corporation or its members and donors to accept a new charter having a different purpose. The contention is that an alteration that would defeat the corporate purpose and prescribe a new one is still forbidden by the contract clause.

It has been said that the *Dartmouth College* case, *supra,* would perhaps have been decided as it was, even under a reserved power to amend, had the Fourteenth Amendment been then in effect, since it involved a deprivation of property. See Note 40 *Harv. L. Rev.* 891, and

*Scott, Education and the Dead Hand,* 34 Harv. L. Rev.
1, 9. It has been suggested that reservation of a power
to alter or repeal does not extend beyond the alteration
or repeal of the franchises conferred by the charter,
and cannot affect subsidiary contracts, unless the change
can be supported under the police power. Some courts
have held that the reservation extends to subsidiary con-
tracts. Note, 31 *Col. L. Rev.,* 1163, 1166. In dealing
with the internal affairs of corporations, the traditional
tests of due process are not strictly applicable, and it
has been said that the rule that the change must be
confined to the objects for which the charter was pri-
marily granted was borrowed from the English corpo-
ration cases. 31 *Col. L. Rev., supra,* p. 1167 n. 22; *Ware
v. The Grand Junction Water Works Co.,* 2 R. & M. 470
(1831). Cf. *Durfee v. Old Colony and Fall River Rail-
road Company,* 87 Mass. 230 (1862).

The rule that an alteration that defeats or fundamen-
tally changes the corporate purpose is beyond the con-
stitutional power of the Legislature is conceded on both
sides. Whether this is true because it is a violation of
the contract clause of the Federal Constitution we need
not decide. The Supreme Court and our Court of Ap-
peals have both adopted the rule as a constitutional prin-
ciple which has the status of a vested right, whether it
stems from the law of implied contract, the law of prop-
erty, or the corporation law. If the right is violated,
we are constrained to hold that it violates the due process
clause of the Fourteenth Amendment as well as the pro-
visions of Article 23 of our Declaration of Rights and
Section 40 of Article III of the Maryland Constitution.

The nub of the controversy is the character of the
alteration. The appellant says that the fundamental
object of the Endowment Fund is to benefit the Uni-
versity, and the administration of the Fund is secondary
and of no real importance. We think, however, that the
change is fundamental. The charter plan was designed
to retain to the donors, through the exercise of dis-
cretion by their chosen representatives and their self-

appointed successors, a voice in the management and expenditure of the fund, subject, of course, to a veto power by the Regents. The views of this independent group may, from time to time, differ widely from those of the current managers of the University. The plan of public management and private endowment is no more anomolous than the more common one of private management and public contribution.

The appellant argues that the discretion conferred upon the Executive Committee, selected by and from the self-perpetuating members, is not personal but inheres in the office. Hence it might be exercised by court-appointed successors. But we have here no case of necessity, to appoint trustees to prevent a failure of a trust, but simply a case where the Legislature has attempted to remove a private self-perpetuating board and replace it by a public one appointed from time to time by the Governor, without any necessity to effectuate the general purpose or to protect the public interest.

The appellant attempts to minimize the change by arguing that the discretion in any event is subordinate to the general power of management and control over the University by the Regents under Section 240(d), Ch. 14, Acts of 1952. As we have said, the Regents hold a veto power, but as a practical matter an independent board could withhold or condition their grants in such a way as to secure a reasonable compliance with their views and those of the donors.

The appellant argues that the alleged "independence" is not properly shown by the allegations of the bill and exhibits filed, concerning various representations in the publication of "Old Maryland", sponsored by the University or some of its schools, and catalogues inviting subscriptions to the Endowment Fund. But the independence of those who serve in the capacity of trustees in administering the funds entrusted to the corporation is clear on the face of the charter. The importance of their independence is a major question of fact in the case, and the allegations and exhibits are relevant to

that issue, and as bearing upon the implied contracts arising out of the solicitations and subscriptions. This is true even if we assume, without deciding, that the donors parted with all interest in the funds solicited. *St. John's College v. Purnell*, 23 Md. 629, 639. Any donor was, of course, at perfect liberty to make gifts directly to the Board of Regents, and we can only infer that those who chose to channel their gifts through the appellee corporation instead, did so because they preferred it as the repository of their benefactions.

It has been held that a right of management and control, if not a property right in the usual sense, is one of the incidents of ownership that may survive a transfer of the legal and equitable title. In *Allen v. McKean*, 1 Sumner 276, 305 (1st Cir. 1833), Mr. Justice Story said: "Nothing is clearer in point of law, than the right of a founder to have his visitatorial power exclusively exercised by the very functionaries, in whom he has vested it. It is the very substratum of his donation. This is not all. The founder has a right to have the statutes of his foundation, as to the powers of the Trustees, strictly adhered to, except so far as he has consented to any alteration of them. But an authority to alter or modify those powers can never be fairly construed into an authority to take them away from his Trustees, and confer the same powers on other persons."

In *Ohio v. Neff*, 52 Ohio St. 375, 401 (1895), the act incorporating Cincinnati College provided that trustees should be elected annually by the donors, and reserved the legislative power of amendment. In 1892, the legislature passed an act placing the management under the control of the directors of the University of Cincinnati. The act was held void. The court said: "It is no answer * * * to assert that the new directory represents the old corporation, or that the legal title to the property still remains in The Cincinnati College. The mere naked legal title to property has no value, when that title is absolutely severed from its control and beneficial enjoyment. It is the province and the duty of courts to look at the sub-

stance of a transaction, and to ignore refined and unsubstantial distinctions. And we can see no substantial difference between a statute which expressly creates a new corporation and endows it with the property of another body corporate, and a statute, like the one under consideration, which, finding a corporation already existing, vests in the directory of the latter all the powers and rights of property which had belonged to another corporate body. And whether we regard the corporation as the actual and potential proprietor of the property in contention, or whether we consider those who contributed to or created this fund or property as such proprietors, and the corporation a mere agency, created to represent them and carry their will into execution, is immaterial in this connection." Cf. *Sage v. Dillard,* 15 B. Mon. (Ky.) 340, 360, and *Printing House v. Trustees,* 104 U. S. 711, 722. The appellant argues that the case is not in point, for the court was there dealing with a proposed diversion of private funds to an entirely separate institution of a private character. Nevertheless, the language quoted is apposite here on the question of the effect of a change of control. The case of *Lupton v. Leander Clark College,* 194 Iowa 1008, 187 N. W. 496, holding that a change of name was not a legislative alteration of fundamental charter purposes, is readily distinguishable. So also, is the case of *Bryan v. Board of Education,* 151 U. S. 639, 657, involving a change of location, where the court said: "There is no question of diversion of funds, or of change of control or management."

The appellant relies strongly upon the case of *Jackson v. Walsh,* 75 Md. 304, 312 (1892). In that case the charter of the "Maryland Agricultural College", which had been incorporated in 1856 as a stock corporation, prescribed the method of electing 22 trustees and also provided for an annual appropriation by the State to aid the college. Some years later, the college became financially embarrassed and the Legislature in 1866 appropriated money to pay the indebtedness of the col-

lege upon condition that the college make the State the equal joint owner of all its property. This same act reduced the number of trustees to 11 and provided that 4 should be members of the State Board of Education. The act was accepted by the stockholders and a conveyance made. In 1880 the Legislature increased the number of trustees to 12, only 5 of whom were elected by the stockholders, and in 1888, the number of trustees was increased to 18, 5 of whom were elected by the stockholders. Under this act the stockholders elected 5 trustees each year until 1891, when they claimed the right to elect 7 trustees under the Act of 1866. Judge McSherry, speaking for the court, said (p. 313) : "To give to the State a more liberal representation in the Board of Trustees * * * interfered with no contractual, vested, or constitutional rights of the private stockholders."

We think the case is distinguishable on several grounds. The decision was rested in part upon the fact that the Acts of 1880 and 1888 "were acted on and acquiesced in by the stockholders of the college with the full knowledge of their provisions, and thereby were legally accepted". While not stressed in the opinion, it was also a fact that the State appropriations were vital to the continued operation of the college. Upon familiar principles of law relating to corporate reorganization, the giving of control to a financial backer and joint owner of a stock corporation could be upheld as fair and reasonable. Finally, the fact that the State was the equal joint owner gave it a legal right to participate in the management, at least to the extent of its equal ownership and to protect the proposed additions to its investment. Cf. *Miller v. The State,* 15 Wall. (U. S.) 478, where there was a similar change of representation based upon municipal ownership of corporate assets. In the instant case the State has no proprietary interest in the Endowment Fund, the private members are denied any voting rights, and the owners are thus deprived of any participation in the management whatever.

The appellant relies upon the case of *In re Mt. Sinai Hospital,* 250 N. Y. 103, 164 N. E. 871. There an act of the New York Legislature, providing for the election of successors to the existing board of trustees of the hospital by a majority vote of the remaining members, was upheld. The act was challenged by two out of four thousand dues-paying members, after it had been duly accepted by the corporation. This acceptance would, in itself, serve to distinguish the case. The complainants were neither founders, nor the representatives of founders, but were in the position of minority stockholders opposing a continuity of management approved by the overwhelming majority. In a careful opinion by Judge Pound, the court held that the change disturbed no vested right under the circumstances, but clearly recognized the principle that charter alterations must be reasonable and consistent with the scope and object of the act of incorporation.

In the instant case, we think the complete transfer of management and control over the Endowment Fund to the Board of Regents is arbitrary and unreasonable. It defeats the very purpose for which the corporation was formed, for there would have been no need whatever for a separate corporation to hold, invest, control and distribute the fund, unless for the purpose of limiting the control of the Board of Regents. The removal of the limitation is, in effect, a nullification of the charter, without any justification arising out of the police power or an existing proprietary interest in the State.

Since we hold that the Act of 1952 exceeds the permissible limits of the reserved power to amend the corporate charter, it is unnecessary to discuss the other points argued in the briefs.

*Decree affirmed, with costs.*