## LABOR LAW

PUBLIC AGENCIES AND ENTITIES – NLRA – GENERAL
ASSEMBLY MAY ADD THE UNIVERSITY OF MARYLAND
MEDICAL CENTER TO LIST OF ENTITIES SUBJECT TO
MARYLAND COLLECTIVE BARGAINING LAW


November 21, 2013

*David A. Smulski*
*Policy Analyst*
*Department of Legislative Services*
*General Assembly of Maryland*

On behalf of the Senate Finance Committee of the Maryland General Assembly, you have requested our opinion regarding whether the employees of the University of Maryland Medical Center ("UMMC" or "the Medical Center")—the flagship hospital within the University of Maryland Medical System ("UMMS" or "the System")—are covered by either the National Labor Relations Act ("NLRA") or Maryland labor laws. You have also asked us to explain the "status" of UMMS and/or the Medical Center "in relation to State Government." Your request emerges from the Committee's consideration, during the 2013 session, of proposed legislation that would have added the Medical Center to the list of State entities that are subject to Maryland's collective bargaining law. *See* Senate Bill 759 (2013). Given the context in which your request arose, we interpret your request as asking whether the Medical Center—and not the other constituent member hospitals of UMMS—is a State entity and whether the General Assembly could place the Medical Center's employees under the purview of Maryland collective bargaining laws that apply only to State employees.

In our opinion, the Medical Center is exempt from the NLRA and is not currently included within the scope of Maryland's collective bargaining law, which grants protections similar to those in the NLRA to specific classes of State employees. As for the "status" of the Medical Center in relation to the State, we cannot broadly determine whether an entity is an instrumentality of the State for all purposes. Rather, the Court of Appeals requires us to evaluate the entity's State status within a particular statutory context and with reference to the class of entities (such as "instrumentalities of the State" or "public bodies") that the statute covers. The Maryland statute governing

the collective bargaining process, however, does not lend itself to this type of inquiry because it simply *lists* the specific entities to which it applies; it does not identify a general category of entities to which it applies or establish a set of criteria that govern inclusion on the list. Nevertheless, in light of the recent decision by the Court of Appeals that UMMS is an instrumentality of the State for purposes of the Public Information Act ("PIA"), *Napata v. University of Md. Med. Sys. Corp.*, 417 Md. 724 (2011), we conclude that the General Assembly has retained sufficient control over the Medical Center to add it to the list of employers that are covered by the State collective bargaining law if it so chooses.

# I

# Background

## A. *The University of Maryland Medical Center and the University of Maryland Medical System*

The University of Maryland Medical Center traces its origins to the Baltimore Infirmary, which was founded in 1823 by the faculty of the University of Maryland College of Medicine to serve as a teaching hospital. The Infirmary became part of the University of Maryland in 1897 and was renamed the University of Maryland Hospital. It was owned and operated by the University for the next 87 years, first as a private corporation, and then, after merging in 1920 with what is now the University of Maryland, College Park, as a governmental entity. *See* 63 *Opinions of the Attorney General* 106, 109-111 (1978) (citing *University of Maryland v. Williams*, 9 G. & J. 365 (1838)); *see also Pearson v. Murray*, 169 Md. 478, 483 (1936) (concluding that, after the merger with the College of Agriculture in College Park, the School of Law was without question "a branch or agency of the state government").

In 1984, the General Assembly determined that it had become "unnecessarily costly and administratively cumbersome for the University [of Maryland] to finance, manage, and carry out the patient care activities of an academic institution within the existing framework of a State agency, since many applicable laws, management structures, and procedures were developed to implement types of governmental functions which differ from the operations of a major patient care facility." Md. Code Ann.,

Educ. ("Educ.") § 13-302(5).[1] According to the General Assembly, these "patient care operations" would be "more efficiently served by contemporary legal, management, and procedural structures utilized by similarly situated, private entities throughout the nation." *Id.* The Legislature also found that the "interests of the citizens of the State, the region, and the community naturally served by University Hospital will be best met by . . . creat[ing] a separate legal and organizational structure for the medical system to provide independence and flexibility of management and funding, while assuring a compatible and mutually beneficial relationship with the University [of Maryland]." *Id.* § 13-302(7).

On the basis of these concerns, the General Assembly passed legislation creating the University of Maryland Medical System Corporation to own and operate the University Hospital as a "private, nonprofit, nonstock corporation formed under the general corporation laws of this State." *Id.* § 13-301(m); *see generally id.* §§ 13-302–13-313; *see also* 1984 Md. Laws, ch. 288. The legislation also established a process for transferring the assets of the State-owned hospital to UMMS. Educ. § 13-307. The express purpose of the new entity was to "provide medical care of the type unique to University medical facilities for the citizens of the State and region," *id.* § 13-302(1), and "render[] comprehensive health care to the community naturally served by University Hospital . . . ." *Id.* § 13-302(3). Accordingly, the University Hospital became part of UMMS in 1984, as did the University Cancer Center and the clinical arm of the Maryland Institute for Emergency Medical Services Systems (now called the R Adams Cowley Shock Trauma Center). *See id.* §§ 13-301(k), 13-302(8). Subsequently, in 1998, UMMS changed the name of the University of Maryland Hospital to the University of Maryland Medical Center. *See* Maryland Manual, University of Maryland Medical System, http://msa.maryland.gov/msa/mdmanual/25ind/priv/html/medh.html (last visited Nov. 12, 2013).

The legislation that created UMMS addressed the System's relationship to State government. The statute explicitly provided that UMMS "shall not be a State agency, political subdivision, public body, public corporation, or municipal corporation" and exempted UMMS from "any provisions of law affecting only

---

[1]  Unless otherwise indicated, all citations to the Education Article are to the 2008 Replacement Volume and the 2013 Supplement.

governmental or public entities." Educ. § 13-303(a)(2). The System was to be a "private, nonprofit, nonstock corporation formed under the general corporation laws" with "all powers of a Maryland corporation which are not expressly limited by this subtitle," including "the power to convey, lease mortgage, encumber, and otherwise deal with all its assets." *Id*. §§ 13-301(m), 13-303(b).

Although it established UMMS as an ostensibly private corporation, the General Assembly ensured that the State would continue to play a prominent role in the System's governance. For example, the authorizing statute required that UMMS's articles of incorporation and the initial transfer of assets from the State be approved by the Board of Public Works. *Id*. §§ 13-303(a)(1), 13-307(e). The voting members of UMMS Board of Directors are all appointed by the Governor,[2] *id*. § 13-304(b), and the appointments the Governor makes must include three members of the Board of Regents of the University System of Maryland ("USM") and two members of the General Assembly. *Id*. § 13-304(c)(2), (3). The Chancellor of the USM, the President of the University of Maryland, Baltimore, and the Dean of the University of Maryland School of Medicine also serve ex officio as nonvoting members of the UMMS board. *Id*. § 13-304(c)(7).

The General Assembly also provided for continuing operational coordination between UMMS and the University. The Chief Executive Officer of UMMS is elected by the UMMS Board of Directors, but must also be appointed to a "joint office" as Vice President of UMMS by the Board of Regents. *Id*. § 13-304(i). The Medical Center was required to continue to serve as the teaching hospital for the University of Maryland, *see id.*

---

[2] The UMMS Board of Directors submits a list of nominees to the Board of Regents of USM "for comment and to the Governor for consideration." Educ. § 13-304(e). As we have explained in prior advice, however, the final authority to appoint rests solely with the Governor. *See* Letter from William R. Varga, Assistant Attorney General, to Clifford M. Kendall, Chairman of the Board of Regents (Aug. 15, 2008). The Maryland Court of Appeals reached the same conclusion in *Napata*. 417 Md. at 730 ("[A]ll voting members on UMMS Board of Directors are appointed by the Governor . . . ."). Indeed, in 2008, the Governor appointed members to the UMMS board who had not been nominated by the board. *See* Alexander Pyles, *Union Organizing at University of Maryland Medical Center*, Daily Record (Oct. 22, 2012).

§§ 13-302(1), 13-305(a), and "continue to make available medical services to residents of various State institutions whose residents . . . were served by the Hospital." *Id.* § 13-303(l). UMMS is required to enter into annual contracts with the University regarding "all financial obligations, exchanges of services, and any other agreed relationships between the University and [UMMS] for the ensuing fiscal year," *id.* § 13-306(a), and may only establish "nonprofit or for-profit subsidiaries or related entities to the extent approved by the University in the annual contract." *Id.* § 13-303(k).

With respect to personnel, the statute provided that the clinical faculty at the University would serve as the medical staff of the Medical Center and hold positions within both institutions. *Id.* § 13-305(a). Other "University employee[s] working in the medical system" were given the option to remain a University employee covered by the State personnel system or become an employee of UMMS. *Id.* § 13-305(b)(2). Those who elected to become UMMS employees nevertheless remained eligible to participate in the State Employees' Retirement System under certain conditions. *See* Md. Code Ann., State Pers. & Pens. ("SPP") §§ 31-102(2)(xx) and 31-107 (2009 Repl. Vol. and 2013 Supp.).[3] New employees hired after the July 1, 1984 "transfer date," however, qualified as medical system employees exclusively, such that, in practice, University employment would be phased out over time. In the meantime, the Legislature mandated that UMMS "treat medical system University personnel on the same basis as Medical System Corporation employees" and maintain "an integrated seniority list" of UMMS and University personnel. Educ. § 13-305(b)(3), (4).

Certain other aspects of UMMS's operations also reflect a continuing governmental presence. For example, although the medical system was exempted from State procurement laws in general, it was nonetheless required to "conduct procurement activities consistent with minority purchasing standards applicable to State government agencies." *Id.* § 13-303(e). And while the statute includes a specific provision requiring UMMS to retain private counsel to represent the University employees who elected not to become employees of the System, the Attorney General's Office retained the authority to determine whether

---

[3] Unless otherwise indicated, all citations to the State Personnel and Pensions Article are to the 2009 Replacement Volume and 2013 Supplement.

those University employees were entitled to representation in the first place. *Id.* § 13-308(d).

The General Assembly provided that the State would maintain some financial control over UMMS as well. Although UMMS does not depend on the State budget for resources, it must "coordinate" its "fund-raising efforts" with the University of Maryland, *id.* § 13-303(j), and may only receive grants from the General Assembly after approval from the Board of Regents. *Id.* § 13-303(i). Moreover, to ensure the System's "financial independence and stability," the legislation provided that the State Treasurer would hold an "Operating Reserve Fund" from which the System's board of directors could request loans. *Id.* § 13-309. The transfer of such funds requires the approval of the Board of Public Works. *Id.* UMMS also must file annual audited financial statements with the Governor and Board of Regents. *Id.* § 13-303(g).

Finally, the General Assembly gave the Board of Regents and Board of Public Works the authority to terminate UMMS if they both find that UMMS has "failed to realize" its public purposes. *Id.* § 13-311(c). In that event, UMMS assets would revert to the State. *Id.* § 13-311(b).

Since its inception in 1984, UMMS has expanded to form affiliations with eight more "member institutions" in addition to the Medical Center: the University of Maryland Rehabilitation and Orthopedics Institute (formerly Kernan Hospital); the University of Maryland Medical Center Midtown Campus (formerly Maryland General Hospital); the Mount Washington Pediatric Hospital; the University of Maryland Baltimore-Washington Medical Center; University of Maryland Shore Regional Health; the Upper Chesapeake Health System (which includes Upper Chesapeake Medical Center and Harford Memorial Hospital); the University of Maryland Charles Regional Medical Center; and the University of Maryland St. Joseph Medical Center. *See* UMMS, "Member Institutions," http://www.umms.org/hospitals/index.htm(last visited Nov. 5, 2013). It is our understanding that these member institutions were previously private hospitals and, upon affiliation with UMMS, retained some form of separate legal status and currently maintain

their own, separate, boards of directors.[4]  By contrast, the Medical Center is governed directly by the UMMS board and is not a separate legal entity.

### B.   *The National Labor Relations Act*

The National Labor Relations Act was enacted in 1935 in response to "[t]he denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining . . . ."  29 U.S.C. § 151.  Among other things, the legislation established the National Labor Relations Board ("NLRB"). The NLRB facilitates the election of collective bargaining representatives by private-sector employees,[5] investigates charges of unfair labor practices, and adjudicates disputes between private-sector employers and employees under the NLRA.  *See id.* §§ 159-161.  The NLRA does not, however, apply to "any State or political subdivision thereof."  *Id.* § 152(2). Thus, state employers (and employees) are not covered by the NLRA, and they do not fall under the jurisdiction of the NLRB.

Although private hospitals are covered by the NLRA, the particular relationship between UMMS and the State of Maryland rendered uncertain the applicability of federal law to the Medical Center.  In 1989, in part out of concern that federal law might not apply, the General Assembly considered a bill that would have amended the UMMS authorizing statute to grant UMMS employees some of the same labor privileges that State employees enjoyed at the time.  *See* House Bill 303 (1989); Letter from Robert A. Zarnoch, Assistant Attorney General, and Noreen A. Armetta, Staff Attorney, to Del. Anne S. Perkins (March 20, 1989).  The draft legislation was never enacted.

In 1990, an employee at the Medical Center—which at that point was still called the University Hospital—filed a charge with the NLRB alleging violations of the NLRA.  As discussed in

---

[4]   The boards of the various UMMS member institutions are listed on each institution's website.  *See*, *e.g.*, http://www.stjosephtowson.com/About-us/Leadership.aspx (listing Board of Directors of St. Joseph); http://www.shorehealth.org/news/article.shtml?id=940 (listing Board of Shore Regional Health).

[5]   The NLRB does, however, have jurisdiction over the U.S. Postal Service—the only governmental entity with that distinction.  39 U.S.C. § 1203.

more detail below, a regional director of the NLRB[6] concluded that UMMS was a "political subdivision" of Maryland under § 152(2) of the NLRA and therefore refused to issue a complaint for lack of jurisdiction. *See* Letter Determination of the Regional Director, NLRB Region 5, Case 5-CA-20678 (Feb. 7, 1990). The NLRB revisited the issue in 2010 and again concluded that UMMS qualified as a political subdivision and, thus, was not subject to the NLRA. *See* Dismissal Letter from the Regional Director, NLRB Region 5, Case 5-CB-10912 (Sept. 10, 2010).

## C.  *State Collective Bargaining Law*

The Maryland collective bargaining law, enacted in 1999, gives certain classes of State employees the right to collectively bargain, subject to certain exceptions. *See* SPP § 3-301; 1999 Md. Laws, ch. 298; *Maryland Transp. Auth. v. Maryland Transp. Auth. Police Lodge #34 of the Fraternal Order of Police*, 420 Md. 141, 162 (2011). Prior to 1999, State employees' collective bargaining rights were defined by Executive Order. *See* Executive Order 01.01.1996.13. But the Executive Order permitted State employers to enter into only non-binding collective bargaining agreements because, under established Court of Appeals precedent, a government agency was not allowed to enter into a binding agreement that would delegate its discretion without explicit authorization from the General Assembly. *See McCulloch v. Glendening*, 347 Md. 272, 275 (1997).

The collective bargaining law provides such explicit legislative authorization for collective bargaining to employees of the principal departments in the Executive Branch of State government and eleven other specified agencies: the Maryland Insurance Administration, the State Department of Assessments and Taxation, the State Lottery and Gaming Control Agency, the USM, Morgan State University, St. Mary's College of Maryland, Baltimore City Community College, the Comptroller, the State Retirement Agency, the State Department of Education, and, for certain employees, the Maryland Transportation Authority. SPP §§ 3-102(a), 3-301(a). Conversely, the statute identifies certain categories of employees within those agencies who are not

---

[6] The NLRA permits the NLRB to delegate certain decision-making authority to its regional directors, subject to the Board's review. 29 U.S.C. § 153(b).

conferred collective bargaining rights. *See Id.* § 3-102(b). Relevant to our purposes, "employee[s] who [are] entitled to participate in collective bargaining under another law" are not covered by the statute. *Id.* § 3-102(b)(8). Employees covered by the NLRA, therefore, would not be covered by the State law.

Like the NLRA, Title 3 of the Personnel and Pensions Article prohibits unfair labor practices, *id.* § 3-306, establishes procedures for employees to elect a bargaining representative, *id.* §§ 3-401–3-407, and regulates the collective bargaining process. *Id.* § 3-502. Responsibility for administering and enforcing the law is divided between the State Labor Relations Board ("SLRB") and the State Higher Education Labor Relations Board ("SHELRB"). The SLRB has jurisdiction over the employees of all of the units listed in § 3-102 except for the USM, Morgan State, St. Mary's College, and Baltimore City Community College. *Id.* § 3-205(a). Employees of these other government units fall under the jurisdiction of the SHELRB. *Id.* § 3-2A-05(a).

## D.    *Senate Bill 759*

During the 2013 legislative session, the Senate Finance Committee considered Senate Bill 759, which would have added the Medical Center to the list of employers covered by the State collective bargaining law.[7] It appears that the purpose of the proposed legislation was to rectify a perceived inequity between the labor protections afforded to employees at the Medical Center and those provided to similar employees at other UMMS hospitals and private hospitals in general. During hearings on this proposed legislation, the committee heard testimony that the other member hospitals of UMMS were covered by the NLRA and that the eligible employees of all UMMS hospitals, except for the Medical Center, were represented by labor unions.[8] Some legislators and

---

[7]    Senate Bill 759 did not specify whether the Medical Center would be subject to the jurisdiction of the SLRB or the SHELRB, which has responsibility for the University of Maryland employees who work alongside the Medical Center employees. Any future legislation should place the Medical Center under the jurisdiction of a particular regulatory entity.

[8]    In October 2012, the UMMS Board gave labor union officials access to the Medical Center for ninety days to allow SEIU Local 1199 the opportunity to convince certain employees to join the union. *See* Pyles, *Union Organizing at University of Maryland Medical Center.* Based on the testimony at the hearing, it appears that the union's efforts were unsuccessful.

proponents of the bill explained that the Medical Center fell outside the jurisdiction of the NLRB and, hence, that amendments to State law were required to afford Medical Center employees the same collective bargaining rights as the employees at other UMMS hospitals.

UMMS opposed the bill on two grounds. First, the General Counsel asserted that factual circumstances had changed since 1990 and that the NLRB, if faced with the question again today, might well conclude that the Medical Center is no longer a "political subdivision" of Maryland. Second, she argued that the General Assembly could not subject the Medical Center to the jurisdiction of the SLRB (or SHELRB) because the Medical Center is not a State agency and its employees are not State employees. Although the Committee took no further action on the bill, the questions about the Medical Center raised during the hearing appear to have prompted this request for advice. Given that context, we direct our analysis to the Medical Center in particular, rather than the other member hospitals of UMMS, which, as we understand it, already have employees with collective bargaining representation.

## II

### Analysis

We first consider whether the Medical Center is covered by the NLRA. If it is, the provisions of the federal law would likely preempt any effort to add it to the entities subject to Maryland's collective bargaining law. We then examine the Maryland law to determine whether the Medical Center is already encompassed by one of the entities covered by the law; if so, further inquiry into the System's "status" for purposes of collective bargaining would be unnecessary. And finally, as we conclude that neither federal nor Maryland law affords the System's employees collective bargaining rights, we explore whether UMMC remains subject to a level of State control sufficient to enable the General Assembly to add it to the list of employers that are subject to the Maryland law. We believe that it is.

**A.** ***The Medical Center is Exempt from the National Labor Relations Act as a "Political Subdivision."***

The NLRA excludes from its definition of "employer" "any State or political subdivision thereof." 29 U.S.C. § 152(2). Thus,

the collective bargaining rights set forth in federal law do not extend to employees of a state or a political subdivision of a state.

Although UMMS's authorizing statute specifically provides that the system is not a "State agency" or a "political subdivision," the Supreme Court has held that "[f]ederal, rather than state, law governs the determination, under [§ 152(2)], whether an entity created under state law is a 'political subdivision' of the State and therefore not an 'employer' subject to the Act." *NLRB v. Natural Gas Utility Dist. of Hawkins County*, *Tennessee*, 402 U.S. 600, 602-03 (1971); *see also Shelby County Health Care Corp.*, 343 N.L.R.B. 346, 358 (2004) (citing *Hawkins County* for the proposition that "state law is not controlling on the question of whether an entity is a political subdivision and that it is to 'the actual operations and characteristics' of the entity that the Board must look in deciding whether the entity is exempt from the Act's coverage"). The fact that the Maryland statute uses the same term as the NLRA, therefore, is not determinative. Federal law governs.

As the Supreme Court has recognized, the NLRA does not define the term "political subdivision," and the "Act's legislative history does not disclose that Congress explicitly considered its meaning." *Hawkins County*, 402 U.S. at 604. However:

> The legislative history does reveal . . . that Congress enacted the [§ 152(2)] exemption to except from Board cognizance the labor relations of federal, state, and municipal governments, since governmental employees did not usually enjoy the right to strike. In the light of that purpose, the Board . . . "has limited the exemption for political subdivisions to entities that are *either* (1) created directly by the state, so as to constitute departments or administrative arms of the government, *or* (2) administered by individuals who are responsible to public officials or to the general electorate."

*Id.* at 604-05 (quoting the NLRB's brief) (emphasis added)*; see also N.L.R.B. v. Princeton Memorial Hosp.*, 939 F.2d 174, 177 (4th Cir. 1991) (describing "two part test in *Hawkins County*"); *Univ. of Vermont*, 297 N.L.R.B. 291, 294-95 (1989) (applying test to University).

In a 1990 decision, an NLRB regional director concluded that UMMS was a "political subdivision," relying on both prongs of the Supreme Court's decision in *Hawkins County*. With respect to the first prong, the regional director first noted that "the Employer is a corporation . . . established directly by an act of the [Maryland] General Assembly" and that the legislation required UMMS to enter into annual contracts with the University. Letter Determination of the Regional Director, Case 5-CA-20678, at 1. He also emphasized that over 200 employees—including the one who brought the charges under review—"retain[ed] their eligibility for State employee benefits" and that, therefore, "the Employer in the instant case operates as a joint employer with the University . . . ." *Id.* With respect to the second prong, the director reasoned that "the Employer is administered by a board of directors, all of whom are appointed by the governor" and that the CEO of UMMS "concurrently serves as a vice president" of the University of Maryland. *Id.* at 1-2. On the basis of these facts, the Regional Director concluded that the NLRA did not apply:

> The Board does not have jurisdiction over employers which constitute departments or administrative arms of the government or over employers administered by individuals who are responsible to public officials or to the electorate. From these facts, it would appear that [UMMS], in addition to its status as a joint employer with a department or administrative arm of the state, is also an entity administered by individuals who are responsible to public officials or to the electorate. I therefore am refusing to issue [a] complaint in this matter.

*Id.* at 2 (internal citations omitted). Another NLRB Regional Director reaffirmed this determination in 2010, concluding that "UMMS is an instrumentality of the State of Maryland; thus, it is excluded from the National Labor Relations Board's jurisdiction under Section [152(2)] . . . ." Dismissal Letter from the Acting Regional Director, NLRB Region 5, Case 5-CB-10912.

These decisions establish that, at least as of 2010, the NLRB did not believe it had jurisdiction over the Medical Center. Given that all voting UMMS board members remain gubernatorial appointees, we see little reason to believe that the NLRB would

not still find that the Medical Center is "administered by individuals who are responsible to public officials or to the general electorate."[9] *Hawkins County*, 402 U.S. at 604-05. Under federal law, this is sufficient to exclude an employer from the jurisdiction of the NLRA as a "political subdivision." *Id.; see also Univ. of Vermont*, 297 N.L.R.B at 295 (finding the University of Vermont to be a political subdivision of the State of Vermont, and thus exempt from coverage under the NLRA, where "12 of the 21 trustees are selected by the State, either by legislative election or by gubernatorial appointment"). As noted above, this view is also consistent with our previous advice, issued in 1989, that UMMS was likely exempt from the NLRA because "it is clear that the Corporation is administered by individuals who are responsible to public officials." March 20, 1989 Advice Letter at 2.

To be sure, some circumstances have changed since 1990. For example, fewer employees of the Medical Center remain part of the State personnel system. As a result, the Medical Center is not a "joint employer" with the University to the same extent it was in 1990. Nevertheless, even if changed circumstances have weakened part of the rationale for the NLRB's earlier decision, the regional director's analysis also rested on the alternative,

---

[9] Although the UMMS statute contains no provisions governing the removal of the UMMS board members, the NLRB has explained that the power to remove a board member is a factor, but not the "critical factor," in determining whether an entity is responsible to public officials. *Economic Sec. Corp.*, 299 N.L.R.B. 562, 565 (1990), overruled on other grounds by *Enrichment Services Program, Inc.*, 325 N.L.R.B. 818 (1998). "Responsibility to public officials or the general electorate has never been interpreted to require that the board members be subject to removal from office by public officials . . . in addition to being placed in office by public officials . . . ." *Economic Sec. Corp.*, 299 N.L.R.B. at 564. The NLRB has on multiple occasions found that an entity was a political subdivision for purposes of the federal law even without any evidence that the Board members could be removed by public officials or the electorate. *Id.* at 564-65 (citing *Univ. of Vermont*, 297 N.L.R.B. at 295 n.23; *Prairie Home Cemetery*, 266 N.L.R.B. 678 (1983); *Community Health & Home Care*, 251 N.L.R.B. 509 (1980); *Northern Cmty. Mental Health Ctr.*, 241 N.L.R.B. 323 (1979); *City of Austell Nat. Gas Sys.*, 186 N.L.R.B. 280 (1970)). It is worth noting, however, that a former Chairman of the NLRB disagreed and claimed that "a critical factor in establishing accountability under the *Hawkins* analysis is whether public officials or the general electorate have an unfettered right of removal during an individual's term." *Oklahoma Zoological Trust*, 325 N.L.R.B. 171, 173 (1997) (Gould, dissenting).

unchanged ground that the UMMS Board of Directors was appointed by the Governor. And the NLRB re-affirmed its position only three years ago, having concluded again that UMMS remains "an instrumentality of the State of Maryland" for purposes of its jurisdiction. Dismissal Letter from the Acting Regional Director, NLRB Region 5, Case 5-CB-10912.[10] Given that the NLRB's position is consistent with our prior advice, we see little reason to withhold the deference ordinarily afforded a federal agency's interpretation of the statute it administers. *Lechmere v. NLRB*, 502 U.S. 527, 536 (1992) ("Like other administrative agencies, the NLRB is entitled to judicial deference when it interprets an ambiguous provision of a statute that it administers."). Thus, we conclude that UMMS is currently not subject to the NLRA.

### B. Current Applicability of the Maryland Collective Bargaining Law

As explained above, Maryland's collective bargaining law specifically identifies the categories of employees who do, and do not, enjoy such bargaining rights. *See* SPP § 3-102(a). Neither the Medical Center nor UMMS is listed in § 3-102(a) as a governmental unit to which the law is applicable. The statute thus currently does not afford collective bargaining protections to employees of the Medical Center. Legislation would be necessary to bring the Medical Center within the scope of Maryland's collective bargaining law.[11] We turn now to whether the State maintains sufficient control over UMMS to do so.

---

[10] Because the Medical Center meets the second part of the *Hawkins County* test, there is no need to determine whether it would also constitute an "administrative arm of the government" under federal law. However, the Court of Appeals decision in *Napata*, which will be discussed in more detail below, suggests that the NLRB might still find that the Medical Center also meets the first part of the *Hawkins County* test.

[11] Although your request asks us to consider whether the Medical Center may be subject to "various" labor laws, we assume based on the context in which your request arose—and your focus on the NLRA— that you were asking about the Maryland collective bargaining law.

### C.   The General Assembly Retains Sufficient Control over UMMS to add the Medical Center to the List of Employers Covered by the Maryland Collective Bargaining Law

During the hearings on Senate Bill 759, legislators and witnesses questioned whether the Medical Center was a State entity and whether its employees could be considered State employees for purposes of adding them to the collective bargaining law.  These questions reflected a concern that it would be incongruous, or perhaps even illegal, to place the Medical Center under the jurisdiction of the SLRB or SHELRB if the Medical Center were not a State entity.  In response to this concern, you asked us to explain the "status" of the Medical Center "in relation to State government."

We are not able to provide a definitive characterization of the Medical Center's State status that would apply in each and every context; instead, we must consider whether an entity is a State entity "for a particular purpose." *A.S. Abell Publishing Co. v. Mezzanote*, 297 Md. 26, 35 (1983) (regarding the PIA).  We must, therefore, "look to the characteristics and functions of [the entity] *in the context of the particular statute at issue* to determine whether [the entity] is intended to be viewed, for purposes of that statute, as a State entity."  78 *Opinions of the Attorney General* 128, 134 (1993) (emphasis added).  And even within a particular statutory context, "there is no single test for determining whether an entity is a unit or instrumentality of the State." *Napata*, 417 Md. at 733.  Rather, to determine "whether a statutorily-established entity is an agency or instrumentality of the State for a particular purpose," we must examine "[a]ll aspects of the interrelationship between the State and the statutorily-established entity." *Mezzanote*, 297 Md. at 35.

We have recognized that this is "essentially an ad hoc" inquiry, 70 *Opinions of the Attorney General* 30, 34 (1985), and, as a result, "an entity may be considered an agency, unit, or instrumentality of government for one purpose, but not for another." 71 *Opinions of the Attorney General* 206, 211 (1986). For example, the Court of Appeals has concluded that the Washington Suburban Sanitary Commission ("WSSC") is a State entity for purposes of sovereign immunity, *Katz v. Washington Suburban Sanitary Comm'n*, 284 Md. 503, 512 (1979), and the Administrative Procedure Act, *Donocam Assocs. v. Washington Suburban Sanitary Comm'n*, 302 Md. 501, 510 (1985), but is not a "state agency" for the purpose of a statute that provided citizens with a process for obtaining from the Office of the Comptroller a

refund of excess agency charges. *Washington Suburban Sanitary Comm'n v. C.I. Mitchell & Best Co.*, 303 Md. 544, 561 (1985).

With respect to UMMS specifically, we have similarly reached different conclusions about the System's status depending on the specific context. For example, we have previously advised that UMMS was "not a public entity" for purposes of the Maryland Constitution's prohibition on members of the General Assembly holding multiple State offices, *see* Letter from Robert A. Zarnoch, Assistant Attorney General, to Sen. Laurence Levitan (March 12, 1984), was not a "public body" under the Open Meetings Act, Letter from Robert N. McDonald, Assistant Attorney General, to Sen. Joan Carter Conway (Oct. 4, 2007), and was not a "state agenc[y]" for purposes of the law authorizing the Maryland Stadium Authority to construct facilities for State agencies. Letter from Richard E. Israel, Assistant Attorney General, to Matthew Klein, Department of Legislative Services (April 3, 2003). At the same time, we have concluded that UMMS was likely an instrumentality of the State for purposes of the PIA, Letter from Kathryn Rowe, Assistant Attorney General, to Sen. Vera Jones (March 21, 2007), Oct. 4, 2007 Advice Letter at 2-3, and that the General Assembly could require UMMS to acquire the Prince George's County Hospital System because UMMS's "existence is subject to legislative control" and it has "some of the hallmarks of a State entity," such as a board appointed by the Governor. Letter from Bonnie Kirkland, Assistant Attorney General, to Del. Victor Ramirez (Jan. 18, 2007).

The Maryland collective bargaining law, however, does not lend itself to the type of multi-factor analysis used in these cases and advice letters to determine whether an entity qualifies as a State entity for a particular purpose. The collective bargaining law simply *lists* the specific entities to which it applies; it does not apply to "a unit or instrumentality of the State government or of a political subdivision," as does the PIA, *see* Md. Code Ann., State Gov't § 10-611(h), or a "public body" or public "office," as do the Open Meetings Act, *id*. § 10-505, and Article 33 of the Maryland Constitution, respectively. The scope of Maryland's collective bargaining law thus is determined not by whether a specific entity qualifies as a State entity but by whether the subject entity is actually *named* in the law.

The unsuitability of the collective bargaining law to the traditional State entity analysis does not mean, however, that we

cannot answer your ultimate question about whether the Legislature may add UMMC to the list of entities subject to the collective bargaining law. That question, we believe, turns on the extent of the State's power to regulate UMMS and alter the terms of its authorizing statute.

The Legislature's power to alter the form or function of public corporations is plenary. The Court of Appeals has defined a "public corporation" as one that is "created by the Legislature for political purposes, with political powers, to be exercised for purposes connected with the public good, in the administration of civil government." *State v. Bd. of Educ.*, 346 Md. 633, 645 (1997). Because public corporations "are instruments of government subject at all times to the control of the Legislature," *id.*, the Legislature can "amend at will [their] enabling legislation." *Atlantic Golf, Ltd. P'shp v. Maryland Econ. Dev. Corp.*, 377 Md. 115, 125 (2003).

The General Assembly's authority over private corporations is more limited. Under Article III, Section 48 of the Maryland Constitution, private corporations must be chartered under general law unless formed for "municipal purposes" or "where no general laws exist, providing for the creation of corporations of the same general character." While the Legislature retains the power to "alter[]" the charter of any corporation created under the authority of Md. Const., Art. III, § 48, its power is subject to a number of substantive limitations: Legislation affecting private corporations may not "defeat[] or fundamentally change[]" the corporation's purpose or take private property, impair contractual obligations, or otherwise violate constitutional prohibitions. *See Board of Regents of Univ. of Md. v. Trustees of Endowment Fund of Univ.*, 206 Md. 559, 569 (1955); 70 *Opinions of the Attorney General* 180, 193 (1985).

The extent of the General Assembly's power with respect to UMMS thus hinges to some extent on whether the System is a public or private corporation. On this point, the Court of Appeals made clear in *Napata v. University of Maryland Medical System Corporation* that the Medical Center is not a wholly private corporation because it is imbued with numerous public attributes. In *Napata*, the Court concluded that UMMS—which directly controls the Medical Center—is an "instrumentality of the State," at least for purposes of the PIA.[12] 417 Md. at 736-37. It

---

[12] It is not clear whether the Court of Appeals intended this conclusion to apply to all of UMMS's member institutions, including

acknowledged that UMMS had some characteristics of a private entity but held that "the attributes of UMMS's relationship with the State that point to its being an instrumentality of the State predominate over those pointing to its private character, for purposes of the corporation's inclusion in the scope of the PIA." *Id*. (internal quotation marks omitted).

According to the Court, the first attribute pointing toward the medical system's State status was that "UMMS did not exist" until created by the Legislature and "until the State assets were transferred to the corporation." *Id*. at 737. In addition, UMMS "served a public purpose" by "providing health care to the local community . . . and a teaching hospital for University students." *Id*. The Court also observed that the State "remains a visible and compelling force in UMMS's operations," given that (1) all voting members of its board of directors are appointed by the Governor, and at least two are members of the General Assembly; (2) UMMS must coordinate with the University on fundraising and is therefore "not free to compete with the University for private gifts or private or federal grants"; (3) and "its annual contracts [with the University] must be approved by the Regents of the University." *Id*. Moreover, the Court noted that the Board of Regents and the Board of Public Works are empowered to dissolve UMMS if they find that it is not fulfilling its public purpose and, under those circumstances, the assets would revert to the State. *Id.* These facts, the Court concluded, "compel the conclusion that UMMS is an instrumentality of the State." *Id*.

While *Napata* establishes that UMMS is not a wholly private corporation, the Court of Appeals might find that the Medical Center is also not a wholly public corporation because the General Assembly has explicitly provided that UMMS is not a "public corporation." Educ. § 13-303(a)(2); *but see Napata*, 417 Md. at 734 n.5 (cautioning that status as a State entity may depend on "the attributes of the relationship" and not "the terminology used to describe the relationship"). However, in light of *Napata* and the many attributes of State status held by UMMS, we believe that, at the very least, the Medical Center is a type of

those governed by separate boards with a degree of separate legal status, or only the UMMS Board and the Medical Center. Because your opinion request concerns only the Medical Center, we need not determine whether the same rationale would apply to the other UMMS institutions.

quasi-public corporation subject to the continuing control of the Legislature.

The Court of Appeals has explained that a quasi-public corporation is "not a public corporation, and, thus is a private corporation[] [b]ut . . . has the characteristics of a public corporation in function, effect or status."[13] *Potter v. Bethesda Fire Dep't, Inc.*, 309 Md. 347, 357 (1987). Although we have concluded in one instance that the General Assembly did not violate certain constraints on its power when it "terminat[ed]" an existing quasi-public corporation and "replac[ed]" it with a new public corporation, *see* 70 *Opinions of the Attorney General* at 192-94, we are not aware of any Maryland cases that have directly addressed the Legislature's power to regulate quasi-public corporations, or where that power lies on the spectrum between the plenary power to regulate public corporations and the more limited power to regulate private entities. We are confident, though, that wherever that line is drawn, UMMS is sufficiently imbued with public characteristics that the General Assembly retains the power to place Medical Center employees under the jurisdiction of the SLRB or SHELRB if it so chooses. As the Court of Appeals observed, "the General Assembly . . . did not relinquish all control of UMMS," and the State remains "a visible and compelling force in [the Medical Center's] operations." 417 Md. at 730, 737. Indeed, we have previously advised that UMMS is "a creation of statute," the existence of which "is subject to legislative control." March 20, 1989 Advice Letter at 2. We thus conclude that a corporation, like UMMS, that is formed by the State and can be extinguished by the State, and whose management and operations remain subject to significant legislative control may be added to the list of entities subject to the collective bargaining law.[14]

---

[13] For example, we have previously characterized the Blind Industries and Services of Maryland, which like UMMS was created by State statute and has a board of directors appointed by the Governor, as a quasi-public corporation because it was privately owned but imbued with a public interest. *See* 78 *Opinions of the Attorney General* at 134-37.

[14] We recognize that quasi-public corporations can take many different forms, and we do not attempt to articulate a rule here that would apply to all such corporations. As the Court of Appeals has recognized, some quasi-public corporations are imbued with more "governmental" characteristics than others. *Potter*, 309 Md. at 358; *see also* 78 *Opinions of the Attorney General* at 136. We accordingly

Moreover, even if the Court of Appeals were to find that the Medical Center is a wholly private corporation, we would still conclude that the General Assembly has the authority to add the Medical Center to the collective bargaining law. Conferring collective bargaining rights on UMMC employees would not exceed the substantive limits on the Legislature's power to regulate private corporations. To begin with, we see nothing about collective bargaining that would "defeat or fundamentally change" the System's medical purpose. *Cf. State v. Good Samaritan Hospital, Inc.*, 299 Md. 310, 323 (1984) (legislation requiring hospitals that provide foot care to confer staff privileges on qualified podiatrists does not "defeat or fundamentally change Good Samaritan's corporate purpose to erect and maintain a hospital"). The employees of private hospitals have long enjoyed the right to collectively bargain. Indeed, hospitals have been subject to the NLRA to varying degrees since 1935 and, in 1974, Congress amended the NLRA to extend coverage to all acute care hospitals. *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 614-15 (1991).

Nor would extending collective bargaining rights to UMMC employees undermine the particular purpose behind the 1984 legislation creating UMMS. As "found and determined" by the General Assembly, that purpose was to free the hospital of the "laws, management structures, and procedures" uniquely applicable to State agencies. Educ. § 13-302(5). Given that the employees of private hospitals enjoy collective bargaining rights, we fail to see how providing those same rights to UMMC employees would contradict the purpose of the 1984 enactment.

Extending collective bargaining rights to System employees likewise would not abrogate vested property rights, impair the obligation of contracts, or run afoul of any other constitutional prohibition. There are no private property rights at stake here, and "when the General Assembly assigns a 'public' task to a private corporation, the corporation 'acquire[s] no vested inviolable right to that political power,' immune from removal by subsequent legislation." 70 *Opinions of the Attorney General* at 193 (quoting *Williams*, 9 G. & J. at 391, and concluding that repealing charter of quasi-public corporation and replacing it with a public corporation was permissible). And because UMMS was created by statute, "[i]t had no 'incorporators' who could

---

assume that some quasi-public corporations may be subject to more legislative control than others.

challenge the [amendment of its charter] as being an impairment of their contract with the State." 70 *Opinions of the Attorney General* at 193 (citing *Board of Regents*, 206 Md. at 567-68).

We conclude that, even if UMMS is considered a wholly private corporation, legislation adding it to the list of entities subject to Maryland's collective bargaining law would not exceed the Legislature's proper power. But because *Napata* convinces us that UMMS is *not* wholly private, we believe that the Legislature's powers are somewhat closer to its plenary powers over public corporations than to its more limited powers over private entities. Thus, however UMMS is classified, it is our opinion that the Legislature retains sufficient control over the System to add UMMC to the list of entities subject to the Maryland collective bargaining law.[15]

## III

### Conclusion

The Medical Center's employees are not currently covered by either the NLRA or Maryland's collective bargaining statute. However, because the Medical Center is a State entity for at least some purposes and remains a creature of statute within the ultimate control of the State, the General Assembly has the authority to enact legislation that would subject the Medical Center to Maryland's collective bargaining law.

---

[15] Regardless of how the Medical Center is characterized, we do not believe that legislation adding Medical Center to the list of entities covered by the State collective bargaining law would run afoul of the exemption UMMS enjoys from "any provisions of law affecting only governmental or public entities." Educ. § 13-303(a)(2). Although the collective bargaining law currently applies only to "governmental or public entities," *id.*, the new legislation would deal "more specifically" with the subject of labor protections for UMMS employees and would therefore serve as an exception to UMMS's more general exemption. *See Napata*, 417 Md. at 738-39 (quoting *Gov't Emp. Ins. Co. v. Ins. Comm'r*, 332 Md. 124, 132-33 (1993)). We also doubt that the Maryland Constitution's prohibition on special laws, *see* Md. Const. Art. III, § 33, would stand as an obstacle to such legislation. Such a law would not appear to be the type of evil that the special laws provision was intended to prevent, and, given the unique history of UMMS and the special rules that apply to it, the Medical Center would reasonably be considered a "class of itself." *Cities Serv. Co. v. Governor of Md.*, 290 Md. 553, 568-70 (1981).

Douglas F. Gansler
*Attorney General*

Adam D. Snyder
*Chief Counsel, Opinions & Advice*

\* Assistant Attorneys General Katherine D. Bainbridge, Clifton Gray, and Patrick Hughes contributed significantly to the preparation of this opinion.